STEELE BLAKE, Appellant, v. J. O. OSMUNDSON, Appellee.

**VENDOR AND PURCHASER:** Rescission by Purchaser—Right to
1   Rescind—Inadvertent Drawing of Papers. Conduct on the part of one party to a contract will not justify a rescission by the other party unless it is made to appear affirmatively that such conduct (a) was at a time when performance was due, and (b) was an *unqualified* refusal to perform. *Inadvertently* so drawing the papers that a vendor would secure greater advantage than he was entitled to under the contract is not such conduct, the vendor readily offering to waive the provision when the error was called to his attention.

PRINCIPLE APPLIED: A land contract was to be performed at a place other than at vendee's residence. No definite time for performance was provided, but March 1st was tentatively suggested. The vendor made out the notes and mortgage and accommodatingly sent them to his agents at the place where vendee resided, for vendee to sign. Inadvertently, the vendor so drew the papers that the wife of vendee was required to sign them. The contract called for vendee's signature alone. The sole authority of these agents was to deliver the deed when the papers were signed as prepared. Vendee, on February 28th, signed with his signature; but the agents, having no knowledge of the contract, declined to deliver the deed without the wife's signature, and directed vendee to take the matter up with the vendor. Vendee all the time supposed that the insertion of the wife's name was

inadvertent. Vendee did not communicate with the vendor in regard to the error in drawing the papers, *because he did not wish to give the vendor an opportunity to accept the papers with his signature alone.* On March 2d, vendee notified vendor that he (vendee) elected to rescind the contract, on the claim that vendor had refused to convey. The vendor at once replied that vendee's wife need not sign. *Held,* vendee had no grounds for rescission.

TIME: Computation—Date Falling on Sunday. A contract calling for performance on Sunday may be performed at any time on the following Monday. (Sec. 48, Par. 23, Code, 1897.)

*Appeal from Dallas District Court.—*J. H. Applegate, Judge.

Tuesday, October 24, 1916.

Action in equity to affirm an attempted rescission of contract for the sale of land, and to recover property, or its value, delivered to the vendor on his contract. Decree in the court below dismissing plaintiff's petition. Plaintiff appeals. —*Affirmed.*

*O. M. Brockett* and *H. S. Dugan,* for appellant.

*Kenyon, Kelleher & O'Connor,* for appellee.

Gaynor, J.—This is an action in equity to affirm an attempted rescission of contract for the sale of land, and to recover property, or its value, delivered to the vendor under said contract, and for the cancellation of two promissory notes, executed by the vendee in favor of the vendor in pursuance of said contract, and held by the payee at the time of the suit. The vendee is the plaintiff in this suit, the vendor, the defendant. There was a trial below, and judgment and decree entered for the defendant, dismissing plaintiff's petition.

Plaintiff presents two questions for our consideration: First. Was there such a breach of contract by the vendor as to justify a rescission by the vendee? Second. Was a rescission actually effected by the vendee? The facts in this case are substantially as follows:

In the fall of 1913, the plaintiff was a practicing attorney, in the city of Perry, Iowa. Defendant was vice president of the State Bank of Thompson, in Winnebago County, Iowa, and manager and secretary of the Thompson Land Company, a company engaged exclusively in the real estate business. At the time of the occurrence of the matters hereinafter referred to, the office of the land company was located in the bank. Thomas & Atkins, who figure in this deal, were real estate brokers in Perry.

On the 25th day of October, 1913, plaintiff and Atkins, of the firm of Thomas & Atkins, drove a car belonging to the plaintiff to the town of Thompson. There they met the defendant, Osmundson, drove out and looked at the quarter section of land—the land in controversy in this suit. This land was the individual property of the defendant. After examining the land, the plaintiff and Osmundson entered into a written contract for the sale and purchase of said land, in words and figures as follows:

"This duplicate agreement, made this 25th day of October, A. D. 1913, between J. O. Osmundson, of the county of Winnebago and state of Iowa, of the first part, and Steele Blake, of the county of Dallas and state of Iowa, of the second part, witnesseth: That, in consideration of the stipulations herein contained and payments to be made as hereinafter specified, the first party hereby agrees to sell unto the second party the following real estate, situated in the county of Winnebago and state of Iowa, to wit: NW ¼ of Section 35, Township 100, Range 25 west of the 5th P. M., Iowa, for the sum of $13,600, on which said second party hath paid the sum of $1,000, by turning over one Stoddard-Dayton car. And the said second party agrees to pay the remainder of the purchase price as follows: $12,600 by assuming mortgage encumbrance against said premises described as follows: $500 on the 1st day of November, 1914; $500 on the 1st day of March, 1915. Said second party shall also execute to the first party his purchase money mortgages, upon the execution

of the deed hereinafter described, for $6,000, due on or before the 1st day of March, 1924, second mortgage for $5,600, due on or before the 1st day of March, 1919, with interest from date at the rate of 5½% . . . annual interest.

"1.   First party shall furnish for examination by second party an abstract of title, showing a good and marketable title.  In case any defects be found, which first party is unable to correct by the date fixed for the conveyance of the title to second party, the first party shall have a reasonable time to remove said defects, and this contract shall be closed in all respects except that, out of the payments to be made by second party, there shall be withheld the sum of $200, which shall be deposited in the State Bank of Thompson and to be paid by said bank to first party when such defects are corrected.  If the title cannot be made marketable within a reasonable time, this agreement shall be rescinded, and all payments made by second party refunded, and the title reconveyed to first party, such repayment of purchase money to be in full satisfaction of any claims of the second party, who shall not be entitled to damages.

"2.   Second party agrees to pay all taxes and assessments that may hereafter be imposed on said premises, including the taxes of 19. . . ., and will also pay any drainage assessment or taxes against said land.  All improvements placed on said premises shall remain thereon and shall not be removed before final payment is made.

"3.   In case the said second party or his legal representatives shall pay the several sums of money aforesaid, punctually, and at the several times specified, and shall strictly and literally perform all and singular the agreements and stipulations aforesaid, after their true tenor and intent, then the first party will make unto the said second party, a deed, conveying said premises in fee simple, with the ordinary covenants of warranty, excepting, however, from said covenants, the before mentioned taxes and assessments, and all highway and railway rights and all liens and incumbrances created or

imposed by said second party. But in case the second party shall fail to make the payments aforesaid, or any of them, punctually and upon the strict terms and times above limited, or to perform or complete each or any of the agreements and stipulations aforesaid, strictly and literally, without any failure or default, the times of payment being of the essence of this contract, then the first party shall have the right to declare this contract null and void, and, at the election of said first party, as evidenced by such declaration, all rights and interest hereby created shall revert to and revest in said first party (without any act of re-entry, or without any other act by said first party to be performed, and without any right of said second party for reclamation or compensation for moneys paid or improvements made) as absolutely, fully and perfectly as if this contract had never been made. If, however, the said first party shall elect not to declare this contract null and void, in case the second party shall fail to make the payments or any of them, as above stipulated, the second party agrees to pay interest annually at the rate of 8 per cent per annum on all payments on both principal and interest from the date of their maturity.

"4. This contract shall be performed and all payments herein provided for shall be paid at the office of the Thompson Land Company, at Thompson, Iowa.

"5. No assignment of the premises shall be valid, unless the same shall be in writing endorsed hereon and approved in writing by the first party."

At the same time, as a part of the consideration for the purchase of the land, the plaintiff delivered to the defendant the automobile in which he and Atkins drove to Thompson, and executed and delivered to him, also, two notes of $500 each.

In the early part of November, two tenants applied to the defendant to rent the land involved in the contract. Each desired to rent a part. Two leases were drawn and sent by the defendant to Thomas & Atkins, who delivered them to the

plaintiff. On November 14th, plaintiff wrote to the defendant as follows:

"Thomas & Atkins offered me two leases on the farm I bought of you, for grain rent. As I explained to them, I would rather not rent the farm, preferring to take a chance of selling before March 1st. If I do not sell I expect to fence it, and perhaps tile it next summer, and don't want to be bothered with a tenant. You spoke of furnishing me with an abstract to my land. I would like to have the abstract as soon as possible."

On the 17th day of November, the defendant replied to this letter as follows:

"Yours at hand. Would say farm would sell easier having it rented. You will notice, by reading the leases, it is subject to sale, and you have right to go on at any time to make repairs or to tile. It is getting late in the season, so farm would sell easier by being rented. You will notice, by reading leases, there is no expense to you, as they have to furnish all seed and all twine, pay the threshing bill, and haul two fifths of the crop to town free, and deliver half the hay in stack on the premises. Look the leases over and see if you do not think it best to sign. If so, kindly sign and return to me, one copy for each tenant. In regard to the abstract, will get it to you in plenty of time for March settlement."

These leases were retained by the plaintiff, though the record does not show that they ever were signed by him, or that he ever returned to the defendant copies for the use of the tenants.

Matters remained substantially in this condition until about the middle of February, when defendant prepared and forwarded to Thomas & Atkins notes and mortgages to be signed by the plaintiff in conformity with the requirements of the contract. These forms of notes and mortgages were delivered by Thomas & Atkins to the plaintiff, and, on the 21st day of February, plaintiff wrote defendant as follows:

"I have had a little misunderstanding with Thomas & Atkins over my purchase, and I am writing you direct in order that we may understand each other better. You remember I had some correspondence with you in regard to the correction of certain defects in the abstract of title. A few days ago, Thomas & Atkins presented me mortgages on this land in the amounts described in our contract, to be signed by me. I do not want to sign up the mortgages until I have some title to the land, and at present I have nothing but a contract. I suppose that I am entitled to a deed and an abstract continued to the date of the deed, showing marketable title. I would not accept a deed under any other conditions. I would like to have the matter settled up as soon as possible, as I expect to dispose of the place soon. I am not averse to your having a reasonable time to cure the defects in the title. As I told you before, I will do anything that I can to help."

In reply to this letter, the defendant, on the 27th of February, wrote to the plaintiff as follows:

"Yours at hand in regard to purchase of land: would say I have already forwarded the notes and mortgages to Thomas & Atkins. I am today forwarding deed and abstract, so all papers will be together. In regard to title, we are trying to get affidavit. . . . If we fail, . . . you would quiet this title if necessary by us paying your expenses up here. I would not put you to this for nothing, and would allow you $25 for your services, I to pay publication of clerk's costs. . . . I have deposited $200 in said Bank of Thompson as guarantee this will be done. I am taking one step more that the contract does not call for, sending check $25 payable to you accompanying the deed, for yours to be for services for quieting title providing we cannot get affidavit. . . . This action could not be completed till fall term, so we have some more time to get affidavits. I wish to thank you for offering to do this work for us. Hoping this will be satisfactory to you, so we can close up the matter."

On the afternoon of Saturday, the 28th of February, the

plaintiff came to the office of Thomas & Atkins and brought with him the notes and mortgages, duly executed, and found Mr. Thomas in the office. It is the claim of the plaintiff that he executed the instruments sent to him by the defendant, called for by the contract, one note for $6,000, due on the 1st day of March, 1924, secured by a mortgage on the land; another note for $5,600, due on the 1st day of March, 1919, secured also by a mortgage on the land, each bearing interest at 5½ per cent; that the mortgages were executed by himself and his wife, but the notes were signed by him alone; and he claims that he presented them to Thomas and demanded the deed. Here comes the first dispute in the evidence. In the notes, as prepared by the defendant, and sent through Thomas & Atkins to the plaintiff, the wording was, "We promise to pay." In executing the notes before presenting them to Thomas & Atkins, plaintiff scratched out the word "We," and wrote the word "I," and signed the notes himself. Plaintiff testifies as follows:

"On this morning, February 28th, I first took up seriously the question of closing this transaction. I didn't know that Mr. Osmundson had not sent the deed to Thomas & Atkins until a few days after they turned over these notes and mortgages for execution. I asked them if they had the deed, and they said 'No.' I knew that by the provisions of my contract, all the papers were to be delivered and contract consummated at Thompson. I understood the papers were sent down to Perry for my convenience. After I saw Mr. Osmundson's letter of February 28th, I assumed that the contract was to be closed at Perry. I noticed that the notes were drawn for my wife to sign. They were drawn, 'We promise to pay.' I assumed that Mr. Osmundson had made a mistake in making out the papers that way, and I presumed that Thomas & Atkins had instructions to have the papers signed as drawn. I assumed that Thomas & Atkins had been instructed to obtain my wife's signature and my signature to the notes, and when they told me, on February 28th, that the notes were drawn for

both of us to sign, they furnished me no new information. I inferred that from the fact that the papers were prepared by Mr. Osmundson and delivered to me in that form. When I took the papers to the office of Thomas & Atkins, Mr. Thomas alone was there. I called his attention to the fact that I had signed the notes alone, and that I had made the changes, and asked for my deed in exchange for these papers. Mr. Thomas looked at the papers and said he could not take them that way; and said that it would be necessary for Mrs. Blake to sign the notes, in order to make the deal perfectly regular. I urged that it would not be necessary, and we had some argument. I offered to take him to an attorney to prove to him that it was not necessary, but he refused that, and said that they were instructed to have them signed that way; that it was the custom to have them signed that way; that in making all deals they insisted on the wives' signing the notes as well as the mortgages. He said Mr. Atkins knew more about the deal than he did, but he was not at home, would be home in the evening; that he had more personal charge of the matter; that I would have to call him up and talk with him. In the evening of that day, Mr. Atkins called me up and wanted to know what the trouble was. I told him what had occurred; that I offered to deliver the papers with the notes signed by myself. Mr. Atkins said it was customary to have the wife sign; that they always insisted on it; that they would not take them any other way. I told him that I offered these papers, and tendered them then, and insisted on having my deed. We had some considerable talk, and he told me that, if I wanted to talk to him again, I should come to his office. He said Mrs. Blake would have to sign the notes, and that he would not deliver the deed unless she did sign the notes; that those were Mr. Osmundson's instructions. I had no further conversation with him after this. Up to that time I had no thought of rescinding the contract.''

He further testified that he knew he might have commu-

nicated with Mr. Osmundson by telephone touching the signing of these notes. He says, however:

"I supposed he would refuse to take them without the signature of my wife. On Monday, the 2d, I consulted with my present counsel about the matter. I arrived home from Des Moines on Monday evening. The notice of rescission was mailed by me to Mr. Osmundson on that evening. I knew that the mails were a little indirect, and that my letter would probably not reach Mr. Osmundson until March 4th. I did not intend to afford Mr. Osmundson any opportunity to waive the signing of the notes by my wife, at the time I prepared the notice. I intended to call the contract off and declare the rescission without giving him that opportunity, the reason being the hostility I felt towards Thomas & Atkins. It was at my request they got possession of the deed. I did not feel I owed Mr. Osmundson the courtesy of some information as to what my plans were. I did not want to carry out the deal at that time. I had not sold the land. I had tried to sell my contract for the land and had been unsuccessful. I have never been dissatisfied with the lands, and still regard it as a good buy. The first information I had that the deed was with Thomas & Atkins was when I got Mr. Osmundson's letter, and I confirmed this on Saturday when I talked with Thomas."

On the evening of Monday, March 2, 1914, the plaintiff prepared and forwarded to the defendant the following letter:

"I am enclosing herewith notice of rescission of our contract. I had thought, on receipt of your letter last Saturday, that our troubles were over, and went to Thomas & Atkins' office with the mortgages properly signed and acknowledged by my wife and myself and the notes signed by myself. Mr. Thomas astonished me by refusing to deliver the deed unless the notes were signed by my wife. I explained to him that that would be impossible, as I would not consider making an attempt to make my wife personally liable on the notes. Later, I talked to Mr. Atkins on the telephone. He would not listen to my explanations, but informed me that they absolutely

would not turn over the deed unless Mrs. Blake signed the notes. I attempted to argue the question, whereupon he became very angry. I told him that he could accept my papers then, as they were when Mr. Thomas saw them, or not at all. He refused to accept them or to deliver the deed, addressed a few more humiliating remarks to me, and hung up the receiver. Naturally I was much incensed. I positively would not consider for one moment asking Mrs. Blake to sign these notes. I have been in Des Moines today consulting my attorney, and he informs me that it was an extraordinary and totally unwarranted request, and the refusal to convey, a breach of contract. Though I am humiliated and thoroughly exasperated over the affair and am entitled to either specific performance or damages, I shall take neither course, but have elected to rescind and upon repayment call the thing off. I take this course for the reason that outside this breach you personally have been very fair with me. I am sorry that the affair has gone as it has and have explained it that you may understand fully my position."

He enclosed in said letter the following notice of his purpose to rescind:

"March 2, 1914.

"To J. O. Osmundson, Thompson, Iowa, and Thomas & Atkins,
    Agents for the aforesaid J. O. Osmundson, Perry, Iowa:

"You are hereby notified that, on account of your refusal on the 28th day of February, 1914, to convey to the undersigned the NW¼ of Sec. 35, Twp. 100, Range 25 West of the 5th P. M., in Winnebago County, Iowa, according to the terms of a certain contract entered into between J. O. Osmundson aforesaid and the undersigned, on the 25th day of October, 1913, the undersigned having offered to completely perform said contract on that date, and having already partly performed same, now, therefore, the undersigned hereby elects to rescind said contract *in toto,* and demands that he be at once placed *in statu quo* by the return of all payments made by him thereon."

Upon the receipt of this letter and this notice of rescission, the defendant immediately, on the 4th day of March, addressed and forwarded to the plaintiff the following letter:

"Your letter of the 2d inst. at hand. In reply, would say the deal is to be closed here, and the deed has been executed before March 1st. I also deposited $200 in the State Bank of Thompson, as guarantee that the abstract will be fixed, as per our contract, and if you would rather close the deal here you can send up the papers, as I sent them down there as an accommodation and for your convenience. Your wife doesn't need to join in the notes if you don't wish her to. Kindly advise me if you will get the notes and mortgages here as per our contract, or if you wish to sign up those that I prepared for you."

This letter was received by the plaintiff in due course of mail.

On the 3d day of March, Thomas & Atkins wrote the following letter to the defendant, which reached defendant in due time:

"The other day I talked to Mr. Steele Blake about the deal with him and the closing of same. He told Mr. Thomas that he did not want his wife to sign this and would not let her do so; so when I arrive home that evening F. M. told me about this deal or the talk he had with Mr. Blake, so I called him over the phone and tried to explain things to him and told him if he was not satisfied with the way it was for him to go and close this deal with you, as it was just an accommodation that we were handling them; so he said you and him had written several letters and his dealings were all right with you; so I told him it would be all right for him to go up there and close this up. But he tried to hand me a bunch over the phone and tell me that he had offered to settle this deal and he was ready to do so. This was after both of us had explained to him that *we* could not let this contract go through without his wife signed; but then he got loud and I hung the phone up on him, but before I hung the phone up

I told him that if he had anything to say farther to come to our office. So the enclosed letter will explain itself; so if you didn't get one you will know where you stand in this deal. Of course we have closed a lot of deals and they have all been satisfactory in every way, and feel that there is nothing but what we tried to do in this one; so if he thinks he can run it over you he will tie into the wrong fellow also, we are ready any time to send you the papers if you wish them to be sent up there, but believe he has got cold feet in the deal and is trying to kick out; that is all that there is to that. You can let us know at once what you want to do with this deal, as we are ready to send the papers up there if you can arrange for something different. F. M. tried to close this yesterday and he would not stand for it, so you see where he is; all he wants to do is to get out of the deal. Return or keep notice so we will have some for reference.''

On the 29th day of April, the plaintiff, through his attorney, addressed the following letter to the defendant:

''Subsequent to the refusal of your agents at Perry, Iowa, to deliver deed to Mr. Steele Blake of that place, in accordance with the terms of your executory contract with him so to do, he has been acting under my advice with reference to that transaction. He now advises me that, since his notice to you of his election to rescind the contract, following your breach of it, that he has heard nothing further from you, notwithstanding that you hold his two notes of $500 each, together with the automobile, which were delivered in part performance of the contract on his part. This condition cannot continue indefinitely. Unless you restore what you received in the transaction, or can agree upon some satisfactory compromise, the matter will, of course, have to be settled for you by the courts.

''Now, Mr. Blake has authorized me to submit two proposals of compromise: First: He will permit you to keep the automobile and accept as full settlement of all claims by both parties arising out of the transaction, the return to him of

the two notes of $500 each which he delivered to you, and the payment by you to him of $500 cash. Second: With like effect he will accept the return of the two notes, the automobile driven to Perry on its own power in the same condition in which you received it, less ordinary wear and tear, and the payment by you to him for the use you have had of the car, of the sum of $100 cash. These offers are made as the extreme limit of concession, because of Mr. Blake's reluctance to litigate, as he is himself a lawyer and knows what it means; but in order to be available for such purpose, it will be necessary for you to give an immediate answer accepting one or the other of the propositions by mail on receipt of this letter. Otherwise, the offers must be treated as withdrawn.''

To this letter, the defendant replied as follows:

''In reply to your letter of the 29th, would say that I have never refused to close the deal with Mr. Blake, as per our contract, and always have been ready to close the deal at any time. The contract provides for closing the deal here, and I still will give Blake a chance to close the deal as per contract, and this will be the only way this matter can be settled.''

This closed the correspondence between the plaintiff and the defendant.

To go back a little, it appears that the plaintiff wrote to the defendant on the 28th day of February, as follows:

''I have your letter of the 27th in regard to the purchase of the northwest of 35, and note that you have sent the deed and the abstract to Thomas & Atkins. I am very much obliged for your explanation of the matter and will proceed to close the deal up at once. My reason for not charging you anything for quieting title was that I did not want you to think that I was simply trying to make you trouble. However, I will be very glad to accept your check for $25 and pay my personal expenses out of it. I am of the opinion that the only way to straighten out this title is by an action to quiet title. Inasmuch as the act of the general assembly spoken of by your

abstracter is of absolutely no validity, an invalid tax deed cannot be made valid by any legislative act. I don't anticipate any trouble in quieting the title, but, as you say, it will take a little time. Thanking you for your very fair attitude in this matter, I am,''

As bearing upon the authority given Thomas & Atkins by the defendant, at the time the notes and mortgages were sent to them for execution by the plaintiff, we have the letter of the plaintiff accompanying the notes and mortgages, and this seems to be the only authority which was given by the defendant to Thomas & Atkins, touching the closing of this deed:

''I enclose you papers in Steele Blake deal as follows: second mortgage and note $5,600, due on or before March 1, 1919, 6%; first note and mortgage, $6,000, due March 1, 1924, 5½%. Kindly have Mrs. Blake's name inserted, have the mortgages duly acknowledged, and return the papers to me, and I will have the deed recorded and sent to Mr. Blake. No cash to pass in this, so it can be fixed before the rush, as you know we have about fifty deals to close. Kindly call on Blake. The reason I sent papers to you is, I am enclosing a good many others in this same envelope. Also enclose receipt signed by the cashier of this bank, showing I have deposited $200 to furnish abstract showing good, merchantable title.''

The defendant testified that he prepared these notes for the plaintiff to sign in the way in which he was accustomed to prepare them; that they were written out by his daughter and read over to him.

''The notes were prepared for Mr. and Mrs. Blake to sign. I had no notice of any misunderstanding between Blake and my agents until I received the letter dated March 2d, containing the notice of rescission.''

He further testified that he had no telephonic communication with either Thomas & Atkins or the plaintiff, touching the controversy between Thomas & Atkins and the plaintiff. The only controversy, in fact, appearing in this record is as

to what transpired between Thomas and the plaintiff and Atkins and the plaintiff, on the 28th day of February. Plaintiff's contention is hereinbefore set out.

Thomas testifies that the first time he talked with the plaintiff about closing this deal was on the 28th day of February, Saturday, in the office of Thomas & Atkins.

"Mr. Atkins was not in at the time. Mr. Blake presented the papers in this way, that they were signed up, that he had made some changes. On account of changes, I told him I would prefer he would deliver the papers when Mr. Atkins was here. We talked about 20 minutes. We talked about where the papers were intended by Mr. Osmundson to be delivered. I told Blake we had nothing to do with the deal; that, when we produced a purchaser for the land, our relationship to the deal was closed; that he could see Mr. Atkins or settle with Mr. Osmundson where the contract was to be performed by its terms. I told Mr. Blake Mr. Atkins would be home in the evening. In the evening, Mr. Atkins called Mr. Blake up by phone. I heard Mr. Atkins tell him over the phone that if he were not satisfied with what we were doing, he could go to Thompson and settle with Mr. Osmundson, as what we were doing was free gratis, and an accommodation to him, and that if he wished to converse further he should come to the office. We waited quite late for him to come and he didn't come. Blake did not demand the deed or abstract from me. We talked about the mortgage. Mr. Blake had the papers with him when he called on me on Saturday. I examined the papers enough to determine whether I would accept them or refuse them. I had no right to reject them. I did refuse to accept them. I was not connected with the deal any more than being a partner of Mr. Atkins'. I would have accepted them if they had been signed as they were prepared by Mr. Osmundson, and not changed. I had the deed there. I would have called on Mr. Atkins. I told Mr. Blake during the conversation that we were not to handle these papers for any particular commission, but merely for the con-

venience of Mr. Osmundson and mostly to him, and that he should take up his trouble with Mr. Osmundson as he had done in former transactions."

Atkins testified that, in his talk with the plaintiff over the phone on the evening of the 28th, he told plaintiff that he could not accept the papers if they were changed; that if plaintiff went to Mr. Osmundson, he could take it up with him, and that it would be all right with them; that it was merely an accommodation that he (Atkins) was handling that part of it.

"He mentioned at that time that he had been corresponding with Mr. Osmundson, which was very satisfactory, and he could take it up further with him. In our conversation, when I told him that we could not accept the papers as they were, he told me I would accept them that way, or that is the only way I would. He talked very indignantly about it, and I hung up the receiver. I told him if he wished any further conversation to come to the office."

Thomas further testified that Mr. Blake was in the office about 20 minutes. "The entire conversation was devoted to the question as to whether I should accept these papers."

It will be observed that there is really very little controversy between Blake and Thomas & Atkins as to what occurred on the 28th, except that Blake insists that he demanded the deed upon the tender of the notes and mortgages, as signed by him, and the others say that no demand was made for the deed; that the whole conversation related to whether or not they would accept the notes signed by plaintiff alone.

This brings us to a consideration of the legal rights of the parties under the record made. It will be noticed that the written contract of sale does not provide definitely as to the time in which the deal should be consummated, and deeds delivered. If we should assume, however, for the purpose of this case, that it was the understanding of the parties that the deal should be consummated on the

1. VENDOR AND PURCHASER: rescission by purchaser: right to rescind: inadvertent drawing of papers.

1st of March, 1914, notes and mortgages to be then executed
and title passed by deed, this would not help plaintiff's case.
The record discloses that the 1st of March fell on Sunday. The
parties would then have until Monday following to perform.
See Subdivision 23 of Section 48 of the Code, 1897. The plain-

2. TIME: computa-
tion: date fall-
ing on Sunday.

tiff testifies that the 28th day of February
was the first time he ever seriously considered
closing the deal. The correspondence of the
parties indicates a purpose to close it on March 1st. We are
inclined to think, however, from this record, that the 1st of
March was just a tentative suggestion for closing the deal.
There was no specific agreement as to when the deal would be
closed. A strict interpretation of the contract would suggest
that the time for the consummation of the contract, by the
execution of the deed, would not arrive until March, 1915.

There is nothing in the record to suggest that the minds
of the parties had for a moment dwelt on any date, previous
to the 1st of March, 1914, as the date for consummating the
contract. The 1st of March falling on Sunday, this would
give the parties until the 2d of March to tender performance.
It does not lie in the plaintiff's mouth to say that he was given
to understand, or had reason to believe, that a performance
could be tendered prior to the 1st of March. He says that the
first time he seriously considered consummating the contract
was on the 28th of February. The only effort made by him
to perform on his part was on that date. On that date plain-
tiff had in his possession drafts of notes and mortgages pre-
pared by the defendant. The preparation and presentation
of these drafts to the plaintiff for signature was no part of
defendant's contractual obligation. They were prepared and
forwarded for the purpose of facilitating the closing of the
transaction, and were in plaintiff's possession, and he had an
opportunity of examining them some days before the 28th.
He discovered upon an examination, as he says, or as he says
he supposed, that defendant, in drafting the papers, had inad-
vertently prepared them for his wife's signature. He had no

assurance, nor does he claim to have had any assurance, from the defendant that the defendant would insist upon the execution of these instruments in the form in which drafted. He assumed, however, that Thomas & Atkins had instructions to require that they be executed in the form in which they were prepared. The letter discloses no such instructions to Thomas & Atkins from the defendant, nor any instructions as to the manner in which the deal should be closed.

Prior to the day tentatively settled upon as the day for consummating the contract, plaintiff presented notes and mortgages executed in fulfillment of his understanding of what the contract between him and the defendant was. It does not appear that Thomas & Atkins had any knowledge of the contents of the contract between the plaintiff and the defendant. They refused to accept the instruments as signed and executed by the plaintiff, because they were in ignorance of the requirements of the contract, and believed that a performance of the contract required the papers to be executed in the form in which they were delivered to the plaintiff. The whole controversy between the plaintiff and Thomas & Atkins was over the form in which the notes were executed. Plaintiff had knowledge of the contents of his contract and what was required of him; Thomas & Atkins were in ignorance of what the contract contained, or what was required of them. They refused to accept the instruments, as executed, and told him that they had no authority to accept the notes, unless signed by his wife, and that, if he did not desire his wife to sign them, he should take up the matter with the defendant.

Now it is apparent from this record that Thomas & Atkins had no right or authority to consent to a rescission of this contract by the plaintiff. The defendant, as soon as notified of plaintiff's contention, having a knowledge of the requirements of the contract between him and the plaintiff, consented to the receipt of these notes without the signature of the wife, and offered to perform his part of the contract upon the receipt of notes signed by the plaintiff alone. It seems to be

the claim of the plaintiff that this came too late from the defendant; that he had already rescinded the contract; and that the contract was, therefore, at an end. This, we think, is a misapprehension on the part of the plaintiff of the legal status of the parties at the time that plaintiff wrote his letter of March 4th, consenting to receive the notes without the wife's signature.

It must be kept in mind that the contract which the plaintiff claims to have rescinded was a valid, binding contract, and enforceable by each party according to its terms—no fraud, no mutual mistake, no claim that it was inequitable or unjust, or that any fraud entered into its inception or its terms. So we have it on the 28th day of February; the contract was then in full force and effect, and a legal, binding obligation on both parties; no time definitely fixed for its performance; a tentative understanding, however, that it should be performed on or about the 1st of March. This we gather from the correspondence between the parties. Plaintiff claims to have rescinded the contract by his letter and notice of March 2d. He bases his right to rescind on the fact that, on the 28th day of February, he presented himself at the office of Thomas & Atkins with notes and mortgages executed in compliance with the requirements of his contract, tendered them to Mr. Thomas, and Mr. Thomas refused to receive them. It appears that Mr. Thomas understood that the notes were to be executed in the form in which they were prepared by the defendant, and that he could not accept them as executed by the plaintiff, and deliver the deed.

Though there is a controversy between the plaintiff and Thomas & Atkins, we think the fact is that Thomas & Atkins told the plaintiff that they could not accept the notes and deliver the deed unless the notes were executed as prepared by the defendant, but that, if they were wrong in this, he should present them to the defendant himself. There is nothing in the record to show that the defendant ever authorized Thomas & Atkins to refuse to deliver the deed upon the presentation

of the notes signed in the form in which they were presented
by the plaintiff.   There is nothing that could be remotely con-
sidered as giving to these parties a right to act for the defend-
ant in consenting to a rescission of the contract, or to authorize
them to act for the defendant in refusing to perform the con-
tract upon its conditions.   The most that can be said for it
is that they personally refused to accept, for the defendant,
these notes, changed from the original draft, and directed
plaintiff to continue his negotiations with the defendant.
Plaintiff's excuse for not communicating with the defendant
before sending the letter of March 2d with the claimed notice
of rescission was that he did not wish to give the defendant
an opportunity to elect to accept the notes in the manner in
which they were executed by the plaintiff.

The plaintiff comes into a court of equity asking a court
of equity to confirm his act, and to declare this contract at an
end because of his election made to rescind the contract, based
upon the facts herein disclosed.   There does not appear ever
to have been a time when the defendant was not ready, able
and willing to perform his part of this contract strictly and
upon its terms.  .Nor does it appear that the defendant was
ever unwilling to accept the notes as executed by the plaintiff.
Plaintiff bases his right to rescind upon what transpired be-
tween him and Thomas & Atkins on the 28th day of February.
He says:

"I noticed that the notes were drawn to be signed by my
wife.   I assumed that Mr. Osmundson had made a mistake in
making out the papers that way, and I assumed that Thomas &
Atkins had instructions to have the papers signed as drawn.
I inferred that from the fact that the papers were prepared
by Mr. Osmundson, and delivered to me in that form.   I
intended to call the contract off and declare the rescission,
without giving Osmundson the opportunity to consent to the
execution of the notes without my wife's signature, the reason
being the hostility I felt towards Thomas & Atkins.   I didn't
feel I owed Mr. Osmundson the courtesy of some information

as to what my plans were. I didn't want to carry out the deal at that time. I had not sold the land. I had tried to sell my contract for the land, and had been unsuccessful.''

Plaintiff knew, at the time he presented these notes, what the contract required. He knew that the defendant was bound to accept the notes in the form in which they were executed; that that was the defendant's contractual obligation. He assumed that the defendant had prepared the draft of the notes in the form in which they were, through mistake, and he thought that Thomas & Atkins had instructions from the defendant not to accept them unless they were drawn that way. He therefore presented them to Thomas & Atkins, and said that, when they told him that they had no right to accept them unless they were executed as drafted, it was no new information to him. He knew that, if they had instructions to that effect from the defendant, they could not accept them in violation of their instructions, yet he presented them in this form to these men, and refused to notify the defendant of their action that he might have an opportunity to correct their error; refused to make any tender of the notes to the defendant, as executed, at the place where the contract was to be performed, but assumed by a written instrument to rescind and declare the contract at an end.

It is fundamental that, a contract having been legally entered into, one party cannot rescind the contract any more than he could make the contract himself originally. A contract evidences a joint will of the two parties. It can only be rescinded by the joint will of the two parties, and it is plain that one of the parties can no more rescind the contract without the other's expressed or implied assent than he alone can make it. See *McAllister v. Mathews* (Ala.), 52 So. 416. If the parties agree to rescind the contract, and each one gives up the provisions for his benefit, the mutual assent is complete, and the parties are restored to the same rights as if no contract had been made. A contract may be rescinded when it has been procured by fraud, or is the product of a

mutual mistake of the parties. Where the contract is procured by fraud, the party defrauded may rescind it, because fraud vitiates all contracts, and the party who has been defrauded in the contract may retire from its performance without blame. The contract is not binding upon him, because of the fraud, and he may repudiate it and refuse to perform it, without blame. If the contract is the result of a mutual mistake of the parties, equity recognizes the right to withdraw from its performance, because the contract does not express the mind of the parties. But where there is no fraud and no mistake, and the contract has been fully and intelligently entered into between the parties, neither can rescind or withdraw from its performance without the consent of the other.

To this rule, however, there is what may, upon first thought, appear to be an exception; that is, where one party is ready, able and willing to perform and tenders performance, and the other refuses to accept the tender of performance or perform. The party then may consider the contract as rescinded—no longer binding upon him. This, however, is upon the thought that the party who has refused to perform the contract is regarded as having consented to a rescission by the other party, in case the other should elect to do so. Or, in other words, where the default is of such a nature as to justify the party not in default in rescinding and terminating the contract, the defaulter is presumed to assent to such termination; or, in other words, the breach by one party may, in such case, be treated by the other as an abandonment of the contract, authorizing him, if he chooses to do so, to disaffirm it; and thus, the consent of both is manifest—that of one by his conduct, that of the other by his express act. The circumstances must be such as manifest an intention on the part of the party claimed to be in default to abandon the contract, or not to comply with its terms in the future. The contract is considered to remain in force until it is rescinded by mutual consent, or until the opposite party does some act inconsistent with the duty imposed upon him by the contract, which evi-

dences an intent not to further be bound by the contract, or indicates an intent to repudiate or abandon the contract. There must be something in the conduct of the party who is claimed to be in default which evinces an intention to be no longer bound by the contract. See *Dula v. Cowles,* 52 N. C. 290 (75 Am. Dec. 463) ; *Jones v. Mial,* 89 N. C. 92.

Further, the act upon which the person bases his right to no longer be bound by the contract, must involve an unqualified refusal by the other party to perform, and should, in its legal effect, amount to a determination not to be bound by or perform the contract in the future. A mere dispute as to the manner of the performance, a misunderstanding as to the manner in which it shall be performed, not persisted in, does not justify a rescission by the other party. See *Fay v. Oliver,* 20 Vt. 118 (49 Am. Dec. 764).

The failure of the party to perform his part of the contract does not, *per se,* rescind the contract. The other party may still insist upon it, or he may, within a reasonable time, give notice of his intention to also retire from the contract.

In the absence of fraud or mistake, to which reference has been made heretofore, a valid, binding contract cannot be rescinded by one party to the contract, unless the party alleged to be in default has done some act which renders the further fulfillment of the contract impossible or impractical, or has evinced a purpose to abandon the contract or repudiate it, or not to be bound to the fulfillment of its terms. Where one seeks to withdraw from the performance of a contract and have the contract held for naught, and bases his claim on the fact that the other has repudiated the contract or refused to perform its conditions, it must affirmatively appear that the refusal was unqualified, and made at a time when the party seeking to rescind had a right to demand and exact its performance.

The record in this case does not disclose these conditions. As a court of equity, we are asked to say that this contract is not binding upon the parties, and not longer an

enforceable contract between them.   Under the record in this case, we cannot so say.   Nowhere does the record disclose an unqualified refusal of this defendant to perform any of the conditions of the contract upon the terms expressed in the contract.   Everything indicates not only a readiness, but a preparation to perform, a willingness to accede to every reasonable request on the part of the plaintiff, that the performance might be facilitated.   The mere sending of this notice did not amount to a rescission.   The plaintiff could not retire from the contract except with the consent of the defendant, evidenced in some of the ways herein indicated.   We find no equity in plaintiff's contention.

Other questions are discussed, but we think what is herein said disposes of plaintiff's claim.   The action of the district court is right, and is—*Affirmed.*

EVANS, C. J., LADD AND SALINGER, JJ., concur.